UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Robert L. Rouillard,

Plaintiff,

v.

John E. Potter, Postmaster General,
United States Postal Service,

Defendant.

**MEMORANDUM OPINION AND ORDER**
Civil No. 01-2158 ADM/RLE

---

Mark F. Gaughan, Esq., Sivertson and Barrette, P.A., St. Paul, MN, appeared for and on behalf of Plaintiff.

Lonnie F. Bryan, Esq., Assistant United States Attorney, Minneapolis, MN, appeared for and on behalf of Defendant.

---

## I. INTRODUCTION

On March 7, 2003, the Motion for Summary Judgment [Docket No. 11] of Defendant John E. Potter, Postmaster General, United States Postal Service ("USPS") was argued before the undersigned United States District Judge. Plaintiff Robert L. Rouillard ("Rouillard") brings suit under the Rehabilitation Act, alleging disability discrimination and hostile work environment. Rouillard asserts that the USPS failed to reasonably accommodate his disability by not offering him a job reassignment. For the reasons set forth below, the Summary Judgment Motion is denied in part and granted in part.

## II. BACKGROUND[1]

Rouillard is a 55-year-old employee of the USPS, who previously worked as a mail

[1] The facts are considered in the light most favorable to Rouillard. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

FILED MAY 05 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

processing machine operator at the St. Cloud Processing and Distribution Facility ("P&DF") in Waite Park, Minnesota. In late 1997, Rouillard's duties caused him to seek medical attention for pain in his right elbow and forearm. Def. Exs. 13, 15. Rouillard submitted two Federal Employees Compensation Act ("FECA") claims for compensation benefits, which were both accepted by the USPS. Def. Exs. 15, 17, 19, 25. In January, 1998, Dr. Paul W. Schultz, M.D. ("Dr. Schultz"), Rouillard's treating physician, recommended work restrictions for Rouillard. Id. Ex. 20. The repetitive nature of the processing duties was found to exacerbate the numbness and pain in Rouillard's arm and fingers, as well as his circulatory problems. Def. Ex. 22. After an analysis by Chris Harbaugh, an occupational therapist, of Rouillard's ability to do various tasks associated with his job, it was recommended that Rouillard (1) follow the written job description described by his plant manager as closely as possible and to avoid any repetitive tasks for more than two hours at a time, including use of the mail cancelling machine, and (2) to take one to two minute rest breaks twice each hour in order to perform range of motion exercises thereby decreasing fatigue and improving circulation. Id. On February 2, 1998, Rouillard was given a return to work assessment by postal physician Dr. Thomas C. Jetzer, M.D. ("Dr. Jetzer"), which confirmed Rouillard's recommended restrictions. Def. Ex. 24. Dave Seviola ("Seviola"), Rouillard's manager, notified Rouillard that the restrictions would not prevent him from performing required tasks "other than limiting the running of the [mail cancelling machine] to [two] hour increments separated by a break from that type of work." Def. Ex. 23.

In May 1998, Rouillard injured his left hand in a cancelling machine, resulting in another accepted FECA benefit claim with work restrictions on his left hand. Def. Ex. 45. Rouillard continued to have complications with both hands, and by October 1998, Rouillard was reduced to

four hour work days. Def. Ex. 28. Over time, Rouillard became unable to grasp objects and experienced fatigue, numbness, discoloration and cold intolerance in his right hand. Id. On November 9, 1998, Rouillard had ulnar artery reconstruction surgery on his right hand. Def. Ex. 29. While experiencing difficulties using his right hand, Rouillard was still recovering from the injury to his left hand, and on December 9, 1998, Rouillard was restricted to no use of his left hand "except as minimal assist." Rouillard Dep. at 19 (Def. Ex. 3). On January 21, 1999, Dr. Schultz stated that he was awaiting left hand restrictions from another doctor, but that Rouillard's right hand restrictions should continue, he was to limit repetitive tasks, lift no more than five pounds with his right hand, and work in a room where the temperature was over 65 degrees. Def. Ex. 31.

On January 27, 1999, the USPS offered, and Rouillard accepted, a "limited-duty/modified job" in consideration of his right-hand restrictions. Def. Ex. 32. This limited duty job consisted of Rouillard working "tear-ups," or torn pieces of mail needing repair for processing, and was to continue until his right-hand restrictions changed. Id. On February 3, 1999, Dr. Schultz issued permanent work restrictions pertaining to Rouillard's right hand, which were increased on March 31, 1999, to require "no repetitive use" of Rouillard's right hand. Rouillard Dep. Ex. 13 at 25; Def. Ex. 34. Finally, on April 22, 1999, Dr. Schultz restricted Rouillard from any use of his right wrist, which prevented him from performing the limited duty job of working tear-ups because such work could not be accomplished one-handed. Def. Exs. 35, 58 at 23.

On May 7, 1999, Dr. Jetzer examined Rouillard again, and after a review of Rouillard's medical history relating to the condition of his hands dating back to 1990, diagnosed Rouillard with "hypothenar hammer syndrome" and symptoms of "thrombosis developing in the ulnar

artery and affecting the fourth and fifth fingers," as well as coolness and loss of strength and function. Def. Ex. 36 at 7. Dr. Jetzer opined that the repetitive activity of his work for the USPS did not initially cause the condition, but rather that "heavy hammering and impact work with his right hand" caused Rouillard's original injury, as evidenced in Rouillard's medical records, although Rouillard denied performing duties with this type of impact. Id. at 3, 7-9. Dr. Jetzer concluded that the restriction of "no use" of Rouillard's right hand was "totally inconsistent" and "ill-advised." Id. at 8-9. Dr. Jetzer did concur that the restrictions of five pounds lifting, limited repetitive activity and no work in temperatures below 65 degrees were appropriate. Id. Dr. Jetzer identified various specific USPS jobs he believed Rouillard was physically capable of performing, including:

> tearups, hand cancelling with the left hand, taking rubberbands off the bundles with the left hand but holding with the right, taking tray rejects off, flat cancelling, answering phones, and sorting letters.

Id. at 10. Dr. Jetzer concluded by remarking that "this clearly represents a case of inappropriate assignment of causality." Id. Both Drs. Schultz and Matthew D. Putnam, M.D. ("Dr. Putnam"), another of Rouillard's physicians, consider Rouillard's work to be an aggravating factor in his hand pain and cold intolerance. Def. Exs. 20, 38.

In June, 1999, Dr. Schultz modified his restrictions to allow right hand use for "very light assist only." Def. Ex. 37. However, on July 15, 1999, Dr. Putnam restricted Rouillard to "no use of right arm" due to "chronic right arm dysfunction." Rouillard Dep. Ex. 13 at 27. This restriction was reaffirmed on November 18, 1999. Id. at 28.

Until May of 1999, Rouillard's physician's restrictions were accepted by the USPS and his duties were modified accordingly. In May 1999, Rouillard alleges he was officially removed

from doing tear-up work. On January 14, 2000, Seviola, his manager, contacted Sherry Constans ("Constans") at the USPS Office of Injury Compensation ("OIC"), indicating that there was no available work that Rouillard could perform within his restrictions. Seviola Dep. at 24-25 (Def. Ex. 58); Constans Dep. at 25 (Pl. Ex. 2). Seviola's letter requested assistance from the OIC. Id. Seviola stated that he was "required to offer [Rouillard] a limited duty job offer, however with [Rouillard's medical restrictions he could] find no duties that [Rouillard] can perform one handed." Seviola Dep. Ex. 1. Rouillard alleges that after May 1999 he was doing no work, but just sitting in his office, for 23 months. Seviola Dep. at 19; Constans Dep. at 25-27. During this time, Seviola described Rouillard as being "totally unproductive." Constans Dep. at 26. Rouillard expressed frustration at not having a "productive" job do to, stating that: "I don't do anything. I go to work every day and I don't do anything. I sit in the union office for eight hours a day doing nothing." Rouillard Dep. at 4 (Def. Ex. 3).

On September 22, 2000, Ed DeCelle ("DeCelle"), USPS Injury Compensation Specialist, created a list of light duty assignments that could be made available for Rouillard. Def. Ex. 39. The list included nine potential tasks, and was sent to Drs. Putnam and Schultz for indications of which jobs Rouillard could physically perform. In December 2000, both Doctors returned the forms with identical opinions: that of the nine jobs Rouillard was only able to perform one--answering phones. Id. Dr. Schultz noted that this duty was appropriate only with the restriction of "no repetitive writing or use of keyboard." Id.

On October 12, 2000, Rouillard wrote to Wayne Rogers, District Manager, stating that he had been unable to perform limited duty work since February 3, 1999, and that no response resulted from Seviola's January 14, 2000, letter to Constans requesting direction or assistance in

finding work for Rouillard. Constans Dep. Ex. 3. Rouillard stated: "I have not been allowed to do anything at the Waite Park Mn. facility for over twenty (20) months. I travel to the Waite Park facility every day and spend eight and one half hours doing nothing." Id. Rouillard requested an explanation of why he was "in this state of limbo being made an object of ridicule and harassment." Id.

On November 2, 2000, Dr. Gregory Pelletier, Ph.D., L.P., ("Dr. Pelletier"), Rouillard's psychologist, sent a letter to Seviola requesting that Rouillard "be relieved of his responsibility to 'show up at work each day' (in a 'hostile' and nonproductive work environment) and [be] allowed to remain on a compensated status, at home . . . ." Seviola Dep. Ex. 2. On November 22, 2000, DeCelle wrote to Rouillard requesting an update to his April 1999 medical restrictions. In response, Dr. Putnam reiterated that Rouillard should not engage in repetitive right hand use, that he could work 8 hour days, that "fine repetitive hand use may lead to increased symptoms," and that Rouillard's condition is "permanent." Def. Ex. 42.

On January 11, 2001, Seviola wrote to DeCelle stating:

> [Rouillard's] restrictions only allow him to answer telephones. He claims he is not able to take messages or do any form of writing or typing. With these restrictions there is no work available at the P&DF or Main Office.

Def. Ex. 43. Seviola testified that he "exhausted all possible work in [his] plant for [Rouillard] with the restrictions that he has," and that he was frustrated with the OIC's role in Rouillard's situation. Seviola Dep. at 57. Seviola stated: "I think we discussed probably about every light-duty job we have in the building at one time or another, throwing letters, just about anything other employees would do on light duty. And they all fell outside of [Rouillard's] restrictions." Id. at 24-25.

Rouillard testified that he requested "many, many, many times" to be transferred out of the mail handling craft and into the clerk craft in order to do different types of work, but that he was told "no." Rouillard Dep. at 43. Rouillard wants to be "retrained into some productive job," but when asked what kind of job might work he responded:

> I don't know. I can honestly say I don't know what kind of jobs. I can only assume that there are thousands of jobs within the Postal Service. There's 800,000 employees in the Postal Service, there must be thousands of jobs. The Postal Service as an employer should help me find one of those jobs.

Id. at 42-43. Rouillard testified that his co-workers subjected him to disparaging remarks, vulgar hand gestures, hostile looks, vandalism to his vehicles and mutilated time cards as a result of his being at work every day but doing no work. Rouillard Dep. at 99-109, 122-126.

The record shows no documented responses to Seviola's January 11, 2001, request for OIC assistance, nor Rouillard's October 12, 2000, letter to Mr. Rogers. However, Dianne White ("White"), USPS labor relations specialist, wrote to Constans at the OIC on January 16, 2001, noting Rouillard's claim of hostile work environment. White Dep. at 15-16 (Pl. Ex. 1). White noted that "[Rouillard] has medical documentation from a psychiatrist that supports his claims," and stated "we have a serious EEO liability on our hands if we don't take some action soon." Id.

In response, DeCelle instructed Seviola on January 16, 2001, to offer Rouillard a job answering telephones and taking messages left handed. Seviola Dep. Ex. 6. Seviola contacted Constans to express that:

> With [Rouillard's] perception of a hostile work environment and [Seviola's] inability to isolate him, from other employees, while answering phones, I feel this task may expose him to, what in his mind may be hostile looks or comments. Until Randy [Forsman ("Forsman"), USPS workplace intervention analyst,] has had a chance to investigate the situation and make recommendations I do not want to make this job offer.

Id. Seviola testified that "absolutely nothing" came of Forsman's involvement with Rouillard's concerns. Id. at 38.

On March 21, 2001, Rouillard filed a formal "EEO Complaint of Discrimination in the Postal Service." Def. Ex. 1 at 442. Rouillard alleged:

> I am offered/provided no work. I have been 'warehoused' for over two years with nothing to do. I have been subjected to hostile actions and speech. My limitations are severe so much so that Northland District Inj. Comp. [OIC] is content that I spend my days doing nothing.

Id. Rouillard's formal complaint was received on March 26, 2001. Id.

On April 10, 2001, DeCelle made a limited duty job offer to Rouillard. Def. Ex. 44. DeCelle's letter stated that "[t]his job is effective immediately" and that "[b]y refusing this job offer, OWCP will be notified and your compensation may be terminated." Id. The offer was for the position of "modified clerk" with duties described as: "Sit at a desk and answer phones with left hand. Page employees/supervisors. Use left hand to write messages or use keyboard with left hand. Use head set if necessary for telephone." Id. at 2. The job offer specified: "No repetitive use of the right hand. No repetitive writing or keyboard use with the right hand. Temperature of the work area should be at least 60 degrees." Id. at 3. Rouillard signed and accepted this job offer "under protest" explaining the refusal clause was like a threat obligating him to take the position and he was concerned about anticipated harassment that would likely ensue from his coworkers. Id.; Rouillard Dep. at 17-18.

Shortly after commencing these duties, Rouillard began receiving phone calls which he believes were made by coworkers while he was answering phones at work. Rouillard Dep. at 109-11. "Eventually," Seviola relieved Rouillard of his phone answering duties due to the vulgar

phone calls. Id. at 111. Since that time, Rouillard apparently has not been performing the function of answering phone calls. Seviola Dep. Ex. 8.

Rouillard's medical restrictions have only increased over time. On April 18, 2001, Dr. Putnam issued new permanent restrictions to Rouillard for light work with the left wrist, and on August 6, 2001, Dr. Timothy J. Hemming, M.D., restricted Rouillard from highly repetitive activities with his left wrist due to "post-traumatic degenerative changes to the left wrist." Rouillard Dep. Ex. 13 at 39, 43.

Rouillard now alleges disability discrimination and hostile work environment under the Rehabilitation Act, asserting that the USPS failed to reasonably accommodate his disability by refusing to offer him a suitable job reassignment.

## III. DISCUSSION

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th

Cir. 1995). Further, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment . . . . Instead, 'the dispute must be outcome determinative under prevailing law.'" Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citation omitted).

**B. Rehabilitation Act**

Under the Rehabilitation Act, "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . . by the United States Postal Service." 29 U.S.C. 794(a) (2003). Employment discrimination cases brought under the Rehabilitation Act are analyzed under the three-stage burden shifting approach developed by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and later refined by the Court in Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993); Dammen v. UniMed Med. Ctr., 236 F.3d 978, 980 (8th Cir. 2001). Under this framework, the plaintiff bears the initial burden of presenting a prima facie case of discrimination. Dammen, 236 F.3d at 980. If the prima facie case is established, a legal presumption arises that the employer unlawfully discriminated against the plaintiff. Id. This rebuttable presumption shifts the burden[2] to the employer to produce evidence that the plaintiff was rejected (or someone else was preferred) for a "legitimate, nondiscriminatory reason." Id. If the employer articulates such a reason, the presumption disappears and the McDonnell Douglas framework becomes irrelevant. The sole

[2] This framework only shifts the burden of production; the burden of persuasion rests at all times with the plaintiff. Id.

remaining issue is whether or not the employer discriminated. Id. The plaintiff then has an opportunity to prove, by preponderance of the evidence, that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Id. Proof that a defendant's proffered reason is unpersuasive or contrived does not establish plaintiff's claim of discrimination is correct, however. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-47 (2000). That is, it is not enough to *disbelieve* the employer, but rather the plaintiff's explanation of intentional discrimination must be *believed*. Id. at 147.

"The standards used to determine whether [the Rehabilitation Act] has been violated . . . shall be the standards applied under . . . the Americans with Disabilities Act of 1990 ["ADA"]." 29 U.S.C. § 794(d) (2003); see, Stern v. University of Osteopathic Med. and Health Scis., 220 F.3d 906, 908 (8th Cir. 2000). The ADA protects qualified persons with disabilities from discriminatory treatment, and requires employers to offer reasonable accommodation to disabled persons. 42 U.S.C. §§ 12102, 12111 (2003). To obtain relief under the ADA, an aggrieved employee must establish that he has a disability, that he is qualified to perform the essential functions of the job, with or without reasonable accommodation, and that he has suffered adverse employment action because of his disability. Benson v. Northwest Airlines, 62 F.3d 1108, 1112 (8th Cir. 1995). It is undisputed that Rouillard has a disability under the Act. The second requirement is that Rouillard is qualified to perform the essential functions of the job, with or without reasonable accommodation.

A qualified person with a disability is defined as an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of his or her job. 42 U.S.C. § 12111(8). The determination of qualification must be based on the individual's

capabilities at the time of the employment decision. Duda v. Board of Educ. of Franklin Park Pub. Sch. Dist. No. 84, 133 F.3d 1054, 1059 (7th Cir. 1998) (citing 29 C.F.R. § 1630.2(m) (1997)). For purposes of the statute, "consideration shall be given to the employer's judgment as to what functions of a job are essential." Id. Plaintiff bears the burden of proving that he could perform all the essential functions of his job at the time of his termination. Benson, 62 F.3d at 1112. An employer is not obligated to create a position, such as a light duty position, not then in existence. Hoskins v. Oakland County Sheriff's Dep't, 227 F.3d 719, 729 (6th Cir. 2000).

The parties dispute Rouillard's status as a "qualified individual with a disability." In determining Rouillard's status under the Rehabilitation Act, the critical section reads as follows:

> The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.

42 U.S.C. § 12111(8) (2003). The Eighth Circuit considered this provision specifically in a strikingly similar case, Cravens v. Blue Cross and Blue Shield of Kansas City, 214 F.3d 1011 (8th Cir. 2000). Cravens' job required a substantial amount of "keying" on a computer keyboard, and wrist pain due to bilateral carpel tunnel syndrome which caused her doctors to place her under a permanent restriction to avoid repetitive motion and "keying." Id. at 1014. Cravens sued claiming her employer failed to accommodate her disability by reassigning her. Id. at 1015. In reversing the district court's grant of summary judgment to the defendant, the Eighth Circuit held that because Cravens was unable to perform the essential functions of her position due to her disability, defendant "could not have reasonably accommodated her within that position so as to enable her to do her job despite her [medical restrictions]. Instead, the only reasonable accommodation that would have allowed Cravens to continue working for [the defendant] was

reassignment to another position within the company." Id. at 1016-17 (emphasis added). The Eighth Circuit stated that the "terms of § 12111(8) do not limit the 'qualified individual' inquiry to the individual's existing job, . . . [but] include current employees with a disability who seek or desire transfer to another position within the company." Id. at 1017 (emphasis in original). The court read § 12111(8) in the context of § 12111(9), which lists "reassignment to a vacant position" as a reasonable accommodation. Id. The Eighth Circuit held:

> We recognize that reassignment may not be required of employers in every instance. However, the language of the statute, the regulations, and the legislative history [do] clearly indicate that, in certain circumstances, reassignment may be necessary as a reasonable accommodation. . . . Specifically, we conclude that the definition of 'qualified individual with a disability' includes a disabled employee who cannot do his or her current job, but who desires and can perform, with or without reasonable accommodation, the essential functions of a vacant job within the company to which he or she could be reassigned.

Id. at 1018. Accordingly, the USPS has a duty to reassign Rouillard, limited in scope by the following constraints: (1) reassignment is an accommodation of last resort, (2) Rouillard must be seeking an existing position within the company, because the creation of a new position is not required, (3) the existing position must be vacant,[3] (4) the USPS need not "bump" another employee out of his or her job in order to reassign Rouillard, and (5) promotion is not required; the USPS can reassign Rouillard to a lower grade and paid position if the employee cannot be accommodated in the current position and a comparable position is not available. Id. at 1019 (internal citations omitted). Further, the USPS is not obligated to reassign Rouillard to the position he requests, but need only make a "reasonable" accommodation which will not create an "undue hardship" on the USPS. Id. at 1019-20.

---

[3] A "vacant" position includes a position that the employer reasonably anticipates will become vacant in a short period of time. Cravens, 214 F.3d at 1019 n.5.

Material fact questions remain regarding several of these assessments. Rouillard identifies ten specific positions within the USPS for which there were job openings subsequent to May 1999. Rouillard Aff. ¶ 4, Attachs. 1-10 (Pl. Ex. 3). He also alleges that he is qualified and able to perform each of them, and that there may have been other viable positions vacant during the relevant time periods. Id. ¶¶ 5-6. Rouillard asserts that he was unable to apply for the positions because the USPS refused his repeated requests for a transfer into the clerk craft. Pl. Mem. at 12. The USPS does not present evidence to the contrary. Thus, Rouillard has generated a genuine issue of material fact as to whether or not the USPS could have reassigned him to one of the identified positions, or another position, during the relevant time period or currently.

The third requirement is that Rouillard suffer an adverse employment action because of his disability. While it is clear a material issue of fact remains regarding the second requirement, it appears Rouillard did suffer an adverse employment action in USPS's failure to reassign him. However such determination need not be made at this time.

The USPS argues it has a legitimate reason not to switch Rouillard to a different position, because his working in a "productive" job would "endanger[] his health" and thus, be unreasonable. Def. Mem. in Supp. at 17, 22-23. Rouillard asserts he was, and is, fully capable of performing the duties of several positions within the clerk craft. Rouillard Aff. ¶ 5. The USPS's argument does not constitute a sufficient showing that the USPS had a legitimate reason for failing to accommodate Rouillard by reassigning him to a different position. Summary judgment on Rouillard's Rehabilitation Act claim is denied.

Additionally, "the failure of an employer to engage in an interactive process to determine whether reasonable accommodations are possible is prima facie evidence [of] . . . bad faith."

Cravens, 214 F.3d at 1021 (internal citation omitted). While the USPS gave Rouillard interim work tasks, such as answering phones for some period of time, Rouillard presented evidence that he repeatedly requested assistance in locating another job within the USPS and was denied assistance. Rouillard also identified examples of clerk craft positions allegedly available during the relevant time period, and the USPS has produced no evidence that reassigning Rouillard would have created an undue hardship. Such circumstances are sufficient to create an issue of fact as to whether or not the USPS failed to satisfy its obligation to interact actively with Rouillard in the search for an appropriate accommodation. See id. at 1021-22.

**C. Hostile Work Environment**

Rouillard's claim of hostile work environment is also analyzed under the McDonnell Douglas test. To prevail, Rouillard must show (1) he is a member of a protected group, (2) he was subjected to unwelcome harassment, (3) the harassment was based upon discrimination, (4) the harassment affected a term, condition or privilege of employment, and (5) the employer knew or should have known of the discriminatory harassment and failed to take prompt and effective remedial measures to end the harassment. Willis v. Henderson, 262 F.3d 801, 808 (8th Cir. 2001). Evidence of a hostile work environment is based on the totality of the circumstances of the work environment. Delph v. Dr. Pepper Bottling Co. of Paragould, Inc., 130 F.3d 349, 355 (8th Cir. 1997). Factors indicating a hostile work environment include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1994). "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working environment,'" a hostile work environment exists. Id. at 21 (internal citations omitted). The harassment must be sufficient to create an objectively hostile environment. Palesch v. Missouri Comm'n on Human Rights, 233 F.3d 560, 566 (8th Cir. 2000). Generally, a plaintiff must allege more than a few isolated instances. Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 573 (8th Cir. 1997). Off-hand comments and isolated incidents do not generally constitute severe or pervasive harassment. Klein v. McGowan, 198 F.3d 705, 709 (8th Cir. 1999).

The USPS contends that Rouillard is unable to establish a hostile work environment at the P&DF because his complaints are directed at the OIC. The USPS relies on Rouillard's statement that:

> What happened [at the P&DF] was that Mr. Seviola asked for some help from [the OIC] to find a job for [Rouillard] to do, [OIC] never showed up. Dave Seviola's hands were tied. He couldn't do anything because of restrictions. . . . [OIC] simply did not help Dave Seviola to help me. So I couldn't say that Dave Seviola was discriminating against me, . . . [the] perception of what was going on was that [the OIC was] just washing their hands of the whole deal and just sitting on their hands . . . .

Rouillard Dep. at 142. Rouillard asserts that the environment within the P&DF was sufficiently laden with harassment including his being ridiculed by his coworkers.

To sustain this claim, Rouillard must "establish that his . . . employer has created or condoned the continuing existence of a work environment that significantly and adversely affects [his] psychological well-being." Ways v. City of Lincoln, 871 F.2d 750, 754 (8th Cir. 1989). Rouillard must show that he has endured a "steady barrage of opprobrious [discriminatory] comment[s]." Id. (citing Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir. 1981)). Rouillard identifies sporadic comments made by his coworkers over the course of time and

instances where coworkers would get up and leave a picnic table when Rouillard approached muttering "well here he comes." Id. at 125.

While inconsiderate and painful, Rouillard's alleged remarks and occurrences of being subject to mocking glances, rude comments, embarrassing situations and prank phone calls over the course of nearly two years are not actionable as a hostile work environment. See Hathaway v. Runyon, 132 F.3d 1214, 1221 (8th Cir. 1997). Rouillard's testimony also establishes that his supervisors were mindful of his treatment in the workplace. Seviola Dep. Ex. 6. Rouillard alleges that his assumption is that the prank phone calls were from coworkers, but there is no direct evidence of their source. A plaintiff's subjective belief or speculation that statements are discriminatory does not establish a claim of hostile work environment. See Palesch, 233 F.3d at 567; Bradley v. Widnall, 232 F.3d 626, 632 (8th Cir. 2000). The evidence does not establish the requisite showing that, viewed objectively, Rouillard's workplace was sufficiently "permeated" with hostility to create a pervasively abusive work environment. See Bailey v. Runyon, 167 F.3d 466, 469 (8th Cir. 1999). Summary judgment is appropriate on Rouillard's hostile work environment claim.

While Rouillard's hostile work environment claim is not viable on the merits, it is notable that the Eighth Circuit has not specifically recognized a claim for hostile work environment under the Rehabilitation Act or the Americans with Disabilities Act. Jeseritz v. Potter, 282 F.3d 542, 547 (8th Cir. 2002) (internal citation omitted). As such, Rouillard's claim may not properly state a cause of action. For purposes of this Motion, such a cause of action has been assumed, with an understanding that if such a cause of action exists, it would be modeled after a similar action under Title VII. Id.

## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. USPS's Motion for Summary Judgment [Docket No. 11] on Rouillard's Rehabilitation Act claim is **DENIED**, and

2. USPS's Motion for Summary Judgment [Docket No. 11] on Rouillard's hostile work environment claim is **GRANTED**.

BY THE COURT:

ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

Date: May 5, 2003